RECEIVED
JUN 18 2026
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

BISHOP WAYNE R. FELTON, individually,

Plaintiff,

v.

Case No. 0:26-cv- 3013-ECT/EMB

DE'MARIO JIVES, individually, and
DEMAJIO MEDIA LLC,

Defendants.

---

**COMPLAINT**

Plaintiff Bishop Wayne R. Felton, individually, for his Complaint against Defendants De'Mario Jives and DeMajio Media LLC, states and alleges as follows:

**INTRODUCTION**

1. This action arises from Defendants' post-settlement publication of content concerning Plaintiff in violation of a binding Settlement Agreement entered on September 11, 2024 and subsequently enforced by the United States District Court for the District of Minnesota.

2. In Felton v. Jives, Case No. 23-cv-467 (D. Minn.), the parties resolved a defamation action through a court-supervised settlement conference before United States Magistrate Judge Tony N. Leung.

3. As part of that Settlement Agreement, Defendants agreed to remove and delete all content concerning or related to Plaintiff and further agreed not to make any

SCANNED
JUN 18 2026 CK
U.S. DISTRICT COURT ST. PAUL

future posts, statements, broadcasts, livestreams, publications, or other content concerning or related to Plaintiff.

4. Defendants further agreed that any future breach of those obligations would result in liability in the amount of One Hundred Thousand Dollars ($100,000.00) per violation.

5. Defendants negotiated, accepted, and agreed to those obligations through counsel in writing and again personally on the record before the Court, and thereafter received the benefits of the Settlement Agreement and dismissal of the underlying litigation.

6. The Settlement Agreement was subsequently enforced by Order of the Court.

7. Following subsequent enforcement proceedings, the Court determined that alleged violations occurring after December 11, 2024 must be pursued through a separate action rather than through continued enforcement proceedings in the original case, thereby requiring Plaintiff to pursue post-December 11, 2024 breaches through a new lawsuit.

8. This action is brought pursuant to that directive and seeks relief for discrete post-December 11, 2024 breaches of the Settlement Agreement.

9. Despite repeated notice, enforcement proceedings, sanctions proceedings, and judicial warnings, Defendants continued publishing content concerning Plaintiff after December 11, 2024.

10. Plaintiff seeks recovery of contractual liquidated damages, attorneys' fees, costs, specific performance, permanent injunctive relief, and related relief arising from those post-settlement breaches.

## PARTIES

11. Plaintiff Bishop Wayne R. Felton is a resident of Saint Paul, Minnesota.

12. Defendant De'Mario Jives is an individual who operates online media platforms, livestream broadcasts, social media accounts, and related internet publications.

13. Defendant DeMajio Media LLC is a Florida limited liability company that was dissolved on or about August 26, 2025. Prior to its dissolution, Defendant DeMajio Media LLC was a party to the September 11, 2024 Settlement Agreement and was used by Defendant De'Mario Jives in connection with the publication, distribution, and dissemination of online content relevant to this action.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Plaintiff Bishop Wayne R. Felton is a citizen of the State of Minnesota.

16. Upon information and belief, Defendant De'Mario Jives is a citizen of the State of Florida.

17. Upon information and belief, Defendant DeMajio Media LLC was a Florida limited liability company whose sole member was Defendant De'Mario Jives, a citizen of the State of Florida.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred within the District of Minnesota, the Settlement Agreement was negotiated and accepted through proceedings conducted in this District, and the Settlement Agreement was enforced by this Court.

## FACTUAL ALLEGATIONS

### A. Prior Litigation

19. On February 27, 2023, Plaintiff commenced Felton v. Jives, Case No. 23-cv-467, in the United States District Court for the District of Minnesota.

20. The underlying litigation arose from publications made by Defendants concerning Plaintiff.

21. Following litigation and court-supervised settlement proceedings, the parties reached a negotiated settlement on September 11, 2024.

### B. Settlement Agreement

22. On September 11, 2024, the parties entered into a Settlement Agreement resolving the litigation.

23. Among other obligations, Defendants agreed:

a) to remove and delete all posts, statements, and other content concerning or related to Plaintiff;

b) not to make any future posts, statements, broadcasts, livestreams, publications, or other content concerning or related to Plaintiff;

c) not to distribute or transfer information concerning Plaintiff to third parties; and

d) to be liable for a confession of judgment in the amount of One Hundred Thousand Dollars ($100,000.00) per violation in the event of a future breach.

### C. Defendants' Acceptance of the Settlement Agreement

24. Prior to execution of the Settlement Agreement, Magistrate Judge Leung circulated the material settlement terms to the parties.

25. Defendants accepted those terms through counsel in writing.

26. Defendants thereafter personally accepted the Settlement Agreement on the record before the Court.

27. Defendant Jives further confirmed on the record that he was satisfied with counsel's representation and voluntarily agreed to the settlement terms both individually and on behalf of Defendant DeMajio Media LLC.

28. Defendants thereafter received the benefits of the Settlement Agreement, including dismissal of the underlying litigation and resolution of the claims asserted against them.

29. At the time the Settlement Agreement was executed and accepted, Defendant DeMajio Media LLC was an active legal entity and expressly accepted the obligations imposed by the Settlement Agreement through its authorized representative.

30. The Settlement Agreement therefore became a valid and enforceable contract.

### D. Enforcement Proceedings

31. Following Defendants' immediate post-settlement conduct, Plaintiff sought emergency relief from the Court.

32. The Court entered injunctive relief requiring compliance with the Settlement Agreement.

33. The Court subsequently enforced the Settlement Agreement as a Court Order.

34. The Court further found that Defendants continued engaging in conduct concerning Plaintiff, including discussion by rational inference or otherwise. Those findings provided Defendants actual notice that indirect references concerning Plaintiff remained prohibited under the Settlement Agreement.

### E. Enforcement History and Necessity of This Action

35. During subsequent proceedings, the Court determined that alleged violations occurring after December 11, 2024 must be pursued through a separate action.

36. Plaintiff brings this action in direct reliance upon the Court's determination that alleged post-December 11, 2024 violations must be pursued through a separate

action and seeks relief only for those post-December 11, 2024 publications identified herein.

37. Plaintiff alleges that dissolution of Defendant DeMajio Media LLC did not extinguish obligations previously assumed under the Settlement Agreement and did not relieve either Defendant from liability arising from subsequent breaches of those obligations.

**F. <u>Post-December 11, 2024 Violations</u>**

38. Following December 11, 2024, Defendants continued publishing content concerning Plaintiff despite their continuing contractual obligations.

39. The publications identified below occurred after Defendants accepted the Settlement Agreement, after the Settlement Agreement was enforced by the Court, and after Defendants had actual knowledge that future publications concerning Plaintiff were prohibited. Defendants knew that their audience was familiar with the parties, the underlying litigation, and Defendants' prior reporting concerning Plaintiff.

40. Defendants directed those publications to an audience familiar with the parties, the underlying litigation, the Settlement Agreement, prior enforcement proceedings, and Defendants' prior reporting concerning Plaintiff. Plaintiff alleges that reasonable viewers would understand the publications to concern Plaintiff whether identified expressly or by reasonable inference.

### G. Why Reasonable Viewers Understood the Publications to Concern Plaintiff

41. Prior to execution of the Settlement Agreement, Defendants devoted substantial portions of their online broadcasts, livestreams, videos, publications, and commentary to Plaintiff, Plaintiff's family, Plaintiff's ministry, The Holy Christian Church International, and litigation involving Plaintiff.

42. Following execution of the Settlement Agreement, enforcement proceedings, sanctions proceedings, and subsequent court orders, Defendants' audience became further familiar with the litigation, the Settlement Agreement, the Court's rulings, and disputes arising from Defendants' continued discussion of Plaintiff.

43. As a result of that history, Defendants' regular viewers possessed contextual knowledge enabling them to identify Plaintiff even when Plaintiff's name was not expressly stated.

44. Defendants were aware that their audience possessed such knowledge because Defendants themselves repeatedly referenced prior reporting, prior litigation, prior court proceedings, prior allegations, and persons who had previously sued or challenged Defendants.

45. During one or more of the publications identified herein Defendants acknowledged that they did not need to mention anyone's name for viewers to understand whom they were discussing.

46. The Settlement Agreement prohibits content "concerning or related to" Plaintiff and is not limited to content expressly naming Plaintiff.

47. Defendants had actual notice through prior enforcement proceedings that indirect references, contextual references, inferential references, and statements reasonably understood by viewers to concern Plaintiff remained prohibited.

48. Accordingly, the proper inquiry is not whether Plaintiff's name was expressly spoken, but whether a reasonable viewer familiar with the parties, the litigation, Defendants' prior reporting, and the surrounding circumstances would understand the publication to concern or relate to Plaintiff.

## VIOLATIONS

### Violation No. 1

49. On or about December 10, 2024, Defendants published a YouTube video entitled: "We Are GOOD!!!"

50. The publication was made available at:

https://www.youtube.com/watch?v=cjM27IfE7Og

51. The publication occurred immediately following the Court's sanctions ruling and attorneys' fee award and was directed toward the litigation, the Court's rulings, court documents, sanctions proceedings, and persons discussing those matters. During the publication, Defendant discussed the litigation, the Court's rulings, court documents, sanctions orders, and individuals publicly discussing those matters.

52. Defendant stated, among other things, "they come up with this whack ass court case," "you don't have sh*t on me," "read the court documents then," and "they won't talk about the actual facts."

53. Plaintiff alleges that the publication constituted a direct response to the Court's sanctions ruling, attorneys' fee award, and continuing litigation concerning Plaintiff and therefore concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement.

**Violation No. 2**

54. On or about November 9, 2025, Defendants published a YouTube livestream entitled: "LIAR LIAR Bishop J. Drew Sheard DIDNT Shut Down Myron Williams Gossip! BUT LIED!!!"

55. The publication was made available at:

https://www.youtube.com/watch?v=6td5Vgiwrj0&t=13s

56. During the publication, Defendant reaffirmed the truthfulness of prior reporting and repeatedly asserted that his prior stories were supported by "facts, proofs, and receipts."

57. Defendant's repeated assertions that his prior reporting was supported by "facts," "proofs," and "receipts," together with statements that he had never lied and would not change his position, reaffirmed the truthfulness of reporting that had previously been directed toward Plaintiff and that formed the basis of the underlying litigation and Settlement Agreement.

58. A reasonable viewer familiar with Defendants' prior reporting and the underlying litigation would understand such statements as a reaffirmation of the same accusations and narratives previously associated with Plaintiff.

59. Plaintiff alleges that the publication concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement and therefore constituted a separate breach thereof.

**Violation No. 3**

60. On or about January 19, 2026, Defendants published a YouTube livestream entitled: "Marquis Brandologist Smith… Let's Play"

61. The publication was made available at:

https://www.youtube.com/watch?v=O96QSxBm34U

62. During the livestream, Defendant displayed on screen a Facebook post authored by "Marquis Brandologist Smith," who was responding to Defendant's broadcast covering his Pastor who allegedly had issues with his taxes, stating, in part: "Being called a butt kisser by a blogger who loses lawsuits is Powerful! ... He can pay his taxes while you going live every five minutes about him to run up a check to pay that case you lost."

63. The displayed post expressly referenced a blogger, lawsuits, and an alleged lost court case before Defendant responded.

64. The Facebook post was not generated by Defendant. Rather, Defendant made the affirmative decision to display the post to his audience during the livestream, thereby republishing and drawing attention to its contents.

65. Defendant was familiar with the subject matter referenced in the displayed post and understood the litigation-related significance of the references to a blogger, lawsuits, and an alleged lost court case. Despite that knowledge, Defendant chose to

present the post to his audience and engage in extended commentary regarding the matters raised therein.

66. In response to the displayed post, Defendant stated, among other things:

a) "Now, here's the thing about it. I need you to talk what you know. I need you to be legally savvy."

b) "That's not correct. And I'm just speaking very general right now."

c) "Baby, who lost what?"

d) "Because you need to know the legality terms of what you talking about."

e) "What case? Can you spell it out for me? What case? 'Cause y'all try to get me caught up in some stuff. I'm not naming anybody."

f) "This same man that was sleeping with other people's wives."

g) "How many receipts do I need to pull?"

h) "You calling me a liar and I'm only doing my job as a journalist."

67. Rather than redirecting discussion away from the displayed post, Defendant responded directly to allegations that he had lost a lawsuit, disputed the characterization of the litigation, asserted that others did not understand the legal significance of the matter, defended the truthfulness of his prior reporting, challenged viewers to identify the lawsuit being discussed, and then stated that he was "not naming anybody."

68. A reasonable viewer familiar with Defendants' prior reporting, the underlying litigation, the Settlement Agreement, and subsequent enforcement proceedings could understand Defendant's responses as concerning or relating to Plaintiff and the litigation previously resolved through the Settlement Agreement.

69. Defendant's repeated references to the truthfulness of his reporting, his refusal to acknowledge wrongdoing, his discussion of a lawsuit, and his statement that he was "not naming anybody" are materially consistent with the pattern of inferential and contextual references previously addressed by the Court in enforcement proceedings.

70. Plaintiff alleges that the publication concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement and therefore constituted a separate breach thereof.

**Violation No. 4**

71. On or about January 20, 2026, Defendants published a YouTube livestream entitled: "OWE TAXES: PROPHET BRIAN CARN, JUANITA BYNUM BISHOP E BERNARD JORDAN"

72. The publication was made available at:

https://www.youtube.com/watch?v=UqMZb2UFytg

73. During the livestream, a participant posted the following question in the public chat:

"You did a story on some guy who said you owe money. Another blogger said it was to some bishop or preacher. I ask because I didn't get what that was all about."

74. In response, Defendant stated, among other things:

a) "I know what I said in my video."

b) "I didn't say who, what, where, when, and why."

c) "Now, I can't go into a lot of things at this present time."

d) "I can't go into a lot of things at this present time."

e) "I can't and I won't. Not right now."

75. The public-chat question expressly referenced another blogger, a bishop or preacher, and a prior publication concerning an alleged financial dispute before Defendant responded.

76. Rather than disclaiming knowledge of the subject matter or redirecting discussion away from the referenced publication, Defendant acknowledged the prior publication, emphasized that he had intentionally omitted identifying information, and repeatedly stated that he could not discuss additional details "at this present time."

77. Defendant's repeated statements that he could not discuss the matter "at this present time" and "not right now" reasonably implied the existence of a future point at which he expected to discuss the subject further.

78. The Settlement Agreement contains no temporal limitation upon Defendant's obligation to refrain from publishing content concerning or related to Plaintiff. Rather, Defendants agreed not to make any further posts, statements, broadcasts, livestreams, publications, or other content concerning or related to Plaintiff.

79. In light of Defendants' prior reporting concerning Plaintiff, the underlying litigation, the Settlement Agreement, subsequent enforcement proceedings, and prior judicial findings concerning indirect and inferential references, a reasonable viewer could understand Defendant's responses as concerning or relating to Plaintiff and the underlying controversy.

80. Plaintiff alleges that the publication concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement and therefore constituted a separate breach thereof.

**Violation No. 5**

81. On April 11, 2026, Defendants published a YouTube livestream entitled: "THE CHURCH GRIFTER: Marvin Sapp, La'Boris Cole, Brian Carn & Bryan Meadows EXPOSED"

82. The publication was made available at:

https://www.youtube.com/watch?v=OSKiwcUSgdY

83. During the publication, Defendant discussed lawsuits, church misconduct, alleged sexual conduct within a church setting, and stated:

"You ain't got no fear of God when you can sleep around in your church."

"And then you want to turn around and sue someone for talking about it."

"I want to cuss so bad."

"You ain't got no fear of God when you can sleep around in your church and then you want to turn around and sue someone for talking about it."

84. During the publication, Defendant discussed lawsuits, persons who sue public commentators, church misconduct allegations, and subject matter substantially similar to matters previously associated with Plaintiff in Defendants' reporting. Defendant specifically linked allegations of sexual misconduct within a church setting to the act of filing suit against those who publicly discussed such allegations.

85. The references were made in a context where Defendants' audience was already familiar with the underlying litigation involving Plaintiff and Defendant.

86. Plaintiff alleges that reasonable viewers familiar with Defendants' prior reporting would understand the discussion as referring to Plaintiff notwithstanding the absence of an express identification.

87. Plaintiff alleges that the publication concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement and therefore constituted a separate breach thereof.

**Violation No. 6**

88. On May 15, 2026, Defendants published a YouTube livestream entitled: "Church Tea! Le'Andria Johnson, Dr. Cheyenne Bryant, Bishop Linwood Dillard, Keion Henderson & MORE!"

89. The publication was made available at:

https://www.youtube.com/watch?v=KBh5V-BTQVw

90. During the publication, Defendant made several statements, which include:

a) "I had a public figure trying to sue me."

b) "My name was in the blog because I told the truth."

c) "I'mma keep telling the truth."

d) "I didn't lie on anybody."

e) "I don't have to mention nobody's name."

91. Plaintiff alleges that Defendant's repeated references to a public figure who sued him, assertions that he, "told the truth" statements that he "didn't lie," and comments

that he did not have to mention anyone's name constituted indirect references to Plaintiff and the underlying litigation.

92. Defendant's statement that he "didn't have to mention nobody's name" constituted an acknowledgment that his audience could identify the subject of the discussion through context and prior reporting.

93. Defendant's discussion was not limited to the mere fact that a public figure had previously initiated litigation. Rather, Defendant coupled those statements with repeated assertions that he "told the truth," he "didn't lie on anybody," and that he did not have to mention anyone's name. Plaintiff alleges that those statements would be understood by reasonable viewers familiar with Defendants' prior reporting and litigation history as extending beyond any single identified public figure and as concerning the broader controversies previously associated with Plaintiff.

94. Those statements were made after repeated judicial findings that indirect and inferential references could violate the Settlement Agreement.

95. Plaintiff alleges that the publication reaffirmed allegations and litigation-related narratives previously associated with Plaintiff, concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement, and therefore constituted a separate breach thereof.

**Violation No. 7**

96. On or about May 21, 2026, Defendants published a YouTube livestream entitled: "NOT FIRST TIME! COGIC Under Fire Again | Bishop Sheard, Larry Shaw, Brian Carn & Eli Lilly Lawsuit"

97. The publication was made available at: https://www.youtube.com/watch?v=FlESrOr3TZ4

98. During the livestream, a participant identified as "@2TELLTHETRUTH-m6m" posted the following statement in the public chat: "But, what happens when the bloggers who report aren't 'right?' I saw some blogger (I won't name) speak against you and some court case. It's hard to learn what is what."

99. In response, Defendant stated, among other things:

a) "I have not lied yet."

b) "I have not lied."

c) "There are some things that I do want to say, but because I can't right now, I'ma leave it alone."

d) "I got a trump card."

100. Defendant did not disclaim the reference, deny knowledge of the subject matter, or redirect the discussion away from the referenced blogger and court case. Instead, Defendant responded by defending the truthfulness of his prior reporting and discussing matters he claimed he could not presently address.

101. Defendant's subsequent responses repeatedly defended the truthfulness of his prior reporting, referenced a present inability to speak further concerning the matter, and suggested the existence of future information or commentary concerning the underlying controversy.

102. Defendant's statement that he could not discuss certain matters "right now" reasonably implied the existence of a future point at which he expected to speak further concerning the subject being discussed.

103. The Settlement Agreement contains no temporal limitation upon Defendant's obligation to refrain from publishing content concerning or related to Plaintiff. Rather, Defendants agreed not to make any further posts, statements, broadcasts, livestreams, publications, or other content concerning or related to Plaintiff.

104. In light of Defendants' prior reporting concerning Plaintiff, the underlying litigation, the Settlement Agreement, subsequent enforcement proceedings, and prior judicial findings concerning indirect references, a reasonable viewer could understand Defendant's responses as concerning or relating to Plaintiff and the underlying litigation.

105. Plaintiff alleges that the publication concerned or related to Plaintiff within the meaning of Paragraph 1(b) of the Settlement Agreement and therefore constituted a separate breach thereof.

106. Plaintiff has preserved copies of the publications, screenshots, transcripts, metadata, publication dates, view counts, and related evidentiary materials supporting each violation alleged herein.

107. The violations alleged herein reflect a continuing pattern of post-settlement conduct in which Defendants publish content concerning Plaintiff, receive notice of violations, continue discussing Plaintiff directly or indirectly, and persist in conduct prohibited by the Settlement Agreement despite repeated judicial intervention.

108. Each publication alleged herein occurred on a separate date, involved a separate publication decision, was transmitted separately to the public, and therefore constitutes a separate breach independently triggering Paragraph 1(e) of the Settlement Agreement.

## CLAIMS

## COUNT I

## BREACH OF SETTLEMENT AGREEMENT

109. Plaintiff realleges and incorporates by reference Paragraphs 1 through 108.

110. The Settlement Agreement is a valid and enforceable contract.

111. Plaintiff performed all obligations required of him under the Settlement Agreement or was excused from further performance.

112. Defendants materially breached the Settlement Agreement by publishing content concerning or related to Plaintiff in violation of Paragraph 1(b) of the Settlement Agreement.

113. The publications identified above constitute separate breaches of Paragraph 1(b) of the Settlement Agreement.

114. Defendants' breaches were knowing, intentional, and willful.

115. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages including injury to reputation, ministry interests, ecclesiastical standing, professional relationships, organizational goodwill, donor confidence, ministry partnerships, and other harms recognized by the parties as difficult to quantify at the time they negotiated the Settlement Agreement.

## COUNT II

## CONTRACTUAL LIQUIDATED DAMAGES

116. Plaintiff realleges and incorporates by reference Paragraphs 1 through 115.

117. Paragraph 1(e) of the Settlement Agreement provides that Defendants shall be liable for One Hundred Thousand Dollars ($100,000.00) per violation in the event of a breach of Paragraphs 1(a) through 1(d).

118. The liquidated-damages provision was negotiated during a court-supervised settlement proceeding involving represented parties and was expressly accepted as a material term of the parties' agreement.

119. At the time the Settlement Agreement was negotiated, the parties recognized that future breaches involving renewed publication of content concerning Plaintiff would likely cause substantial reputational, ministerial, ecclesiastical, professional, organizational, and relational harm that would be difficult or impossible to calculate with precision.

120. The parties further recognized that future violations could affect Plaintiff's standing among church members, clergy, denominational leaders, ministry partners, donors, prospective donors, conference organizers, ministry networks, and members of the public who encounter such content online.

121. The extent and duration of such harm would depend upon numerous factors including audience size, republication, online distribution, algorithmic amplification, third-party commentary, viewer perception, and continuing availability of content across multiple platforms.

122. Because the nature and extent of such damages could not reasonably be measured in advance, the parties negotiated and agreed upon a fixed liquidated-damages amount intended to provide certainty and avoid future disputes regarding valuation of damages.

123. The liquidated-damages provision was not imposed by one party upon another but was voluntarily accepted as part of a negotiated resolution that enabled dismissal of the underlying litigation.

124. Defendants accepted the liquidated-damages provision through counsel in writing and thereafter personally accepted the Settlement Agreement on the record before the Court.

125. The Settlement Agreement was reached following federal litigation, discovery, motion practice, court-supervised settlement proceedings, and representation by counsel for all parties.

126. Defendants thereafter received the substantial benefits of the Settlement Agreement, including dismissal of pending claims, resolution of litigation exposure, and avoidance of further litigation at that time.

127. The liquidated-damages provision represented a reasonable estimate of anticipated damages at the time of contracting and reflected the parties' recognition that future reputational and ministry-related harm would be difficult to quantify through traditional proof.

128. The provision was specifically designed to deter future violations and to provide an agreed-upon measure of compensation in circumstances where actual damages would be uncertain, diffuse, continuing, and not readily susceptible to precise calculation.

129. Plaintiff relied upon Defendants' acceptance of that provision in agreeing to settle and dismiss the underlying litigation.

130. Defendants cannot now disavow the liquidated-damages provision after accepting its benefits and expressly agreeing to its terms.

## COUNT III

## SPECIFIC PERFORMANCE AND PERMANENT INJUNCTIVE RELIEF

131. Plaintiff realleges and incorporates by reference Paragraphs 1 through 130.

132. The Settlement Agreement imposes continuing obligations upon Defendants.

133. Defendants have repeatedly failed to comply with those obligations.

134. Defendants' history of noncompliance demonstrates that monetary relief alone has been insufficient to secure compliance.

135. Plaintiff has no adequate remedy at law to prevent future violations.

136. Defendants' history of noncompliance includes conduct occurring after execution of the Settlement Agreement, after enforcement of the Settlement Agreement as a Court Order, and after repeated notice that further publications concerning Plaintiff were prohibited.

137. Defendants have demonstrated a continuing pattern of publication, reaffirmation, inferential commentary, and litigation-related discussion concerning Plaintiff despite repeated judicial intervention.

138. Unless restrained, Defendants are likely to continue publishing content concerning Plaintiff in violation of their contractual obligations.

139. Plaintiff continues to suffer irreparable injury to his reputation, ministry, professional standing, goodwill, and related interests.

140. The balance of equities favors enforcement of the Settlement Agreement.

141. The public interest favors enforcement of negotiated settlements and compliance with court orders.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1. Enter judgment finding that Defendants breached the Settlement Agreement;

2. Award liquidated damages of $100,000.00 for each proven violation pursuant to Paragraph 1(e) of the Settlement Agreement;

3. Award attorneys' fees, costs, expenses, and disbursements recoverable under the Settlement Agreement and applicable law;

4. Order specific performance of all continuing obligations imposed by the Settlement Agreement;

5. Permanently enjoin Defendants from publishing, posting, livestreaming, broadcasting, transmitting, distributing, sharing, republishing, commenting upon, discussing, referencing, or otherwise disseminating content concerning or related to Plaintiff;

6. Permanently enjoin Defendants from discussing, commenting upon, referencing, characterizing, summarizing, responding to, or otherwise addressing the

underlying litigation, Settlement Agreement, prior allegations concerning Plaintiff, or related disputes where such statements would reasonably be understood as concerning or relating to Plaintiff.

7. Order Defendants to remove and permanently delete all remaining content concerning Plaintiff from all platforms under their possession, custody, or control;

8. Require Defendants to identify all social-media accounts, channels, websites, archives, repositories, mirror sites, backup locations, alternative accounts, and other online locations under their possession, custody, or control where content concerning Plaintiff has been stored, maintained, published, republished, distributed, archived, or otherwise made available.

9. Require Defendants, within thirty (30) days of judgment, to provide a sworn inventory identifying all content concerning Plaintiff known to Defendants and all locations where such content has been stored, maintained, published, republished, distributed, archived, mirrored, transferred, or otherwise made available.

10. Require sworn platform-by-platform and URL-by-URL certification of compliance;

11. Declare that each proven publication constitutes a separate and independent violation of Paragraph 1(b) and separately triggers Paragraph 1(e) of the Settlement Agreement;

12. Declare that the publications identified above constitute separate post-publications for purposes of determining liability and damages under the Settlement Agreement.

13. Retain jurisdiction to enforce the Court's judgment and orders including expedited enforcement proceedings upon evidence of future violations.

14. Retain continuing jurisdiction to resolve disputes concerning compliance with the Court's judgment, injunctions, declarations, and related enforcement orders entered in this action.

15. Award pre-judgment and post-judgment interest; and

16. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable to a jury.

Dated: June 18, 2026.

*s/Bishop Wayne R Felton*
Pro Se Plaintiff
125 Stevens Street West
St. Paul, MN 55107
Telephone: 651.290.9673
bishop@thcci.org